We're here today because there are two issues before the court. The first is whether or not the district court erred when it granted summary judgment to Officer Billy Mitchell. And the second is whether or not the district court abused its discretion when it struck Mr. Valderas' evidence for failure to respond to each and every one of Mr. Mitchell's points striking Mr. Valderas' evidence. Did you respond to any of them? Your Honor, we didn't. We responded to the Certificate of Service, Your Honor, because it regulated the briefing requirements. That was the very next day. In that specific situation, what occurred was Mitchell's attorneys reached out to Mr. Valderas' attorneys to explain that they would be filing a motion to strike. However, that sounded like a motion to reply. The district court specifically restricts motions, excuse me, reply motions. And so at that time, Mr. Valderas' attorneys specifically asked the defendants exactly what they were filing. They did not clarify that pleading. We requested a motion, we requested a conference, a telephone conference to quickly resolve this issue. It didn't occur. Why did you have to have a telephone conference instead of communicating by email or otherwise? At the time that we were emailing, it appeared that the conversation was seeming to be misinterpreted. And so at that point, we believed it was more important to have a telephone conference. But most importantly... Were you involved in it, or were these other attorneys? I was involved in it directly, Your Honor. But I also want to make sure we make clear in their response, they never, excuse me, in their email, they never requested a motion to reply. They never informed us that we would be filing a motion for leave to file a reply, which is what caused the confusion. The motion to strike, it looked like a motion to reply. And the district court strictly prohibited that. Motion to reply to what now? To the summary judgment. Motion for leave to file a reply, Your Honor, to our response to the motion to strike. And so, in their motion to strike, they were arguing a reply, which is why we had this difficulty and this confusion that came up. But it was not wise to continue to argue that via email, because it was... But then you read it, I mean, you saw they were trying to strike evidence, weren't you? The reply brief, whatever it's titled, comes in on the electronic filing. It clearly is trying to strike evidence, so why don't you file a motion for leave to file a reply, not a motion to respond to the motion to strike. It shouldn't be this complicated. I mean, you might be right about the local rules there. It shouldn't be that complicated, but... I agree with you, Justice Costa. I don't think it should have been that complicated. I honestly believe that filing a motion for leave to file a reply was something that we could have all agreed to. But when I saw it with a motion to strike, we would have filed... I've got to be clear, they didn't file the motion to strike, they filed a motion for leave to file the motion to strike. That was included in the prayer for relief. Even if all your evidence should have been included, let's say we can look at all your evidence, why do you have a case that should go to a jury? Your Honor, this case, unlike a lot of cases that's come before the Fifth Circuit, is one that strictly deals with the objective standard, not the subjective. The District Court erred when they specifically analyzed the facts in this case from the light of Officer Billy Mitchell, not Officer Sergeant Billingsley, who was the officer on the scene. In fact, you will find from the District Court's opinion, he very rarely even talked about Sergeant Billingsley, who had... If you take all facts in favor of Officer Mitchell, they all exit the car and saw Mr. Valdez. Can't two or more officers respond to a situation particularly one in this case? I watched the video where things are happening very quickly. They're dealing with somebody who has a history that is known to them in a circumstance where he is undisputedly armed at some point in the encounter, the beginning of the encounter. There's a dispute about what he did with the gun, but at any rate, can't two or more officers in the same situation respond differently and still have acted reasonably? It seems like you're arguing that, well, if one of them did A, and the other one did B, and B is egregious, then obviously A has set the standard, and B, Officer B, has violated it. Well, Your Honor, the fact that that question is being posed is an interesting one that requires a jury to determine. In fact, if you have two officers who come out and make two different decisions, the question is which one of them is reasonable. And if plaintiff can prove... Well, the question is actually, can both of them have been reasonable in their response, their perception of what they're responding to? Again, we present that, no. In this particular case, they could not have been the same, and nor could they have been reasonable, is your question. And the reason we say that is because Officer Billingsley, excuse me, Sergeant Billingsley, he is a sergeant, exited the vehicle, and there was an ending fact, there was some fact inserted that terminated the threat. This is quite different from a takes a shot in fear of the lives of another officer, which is what happened in Hathaway v. Bazzani, and why the court actually distinguished in Lytle v. Texas Bexar that very scenario. In this case, you can have two different officers that make two different decisions, but that's very contrary to what Tennessee v. Gardner was trying to accomplish. And when I say that, we were looking to see what an officer in the very same situation would do, and that's how we determined what reasonableness. What if we lined up, for example, 10 different officers, and five of them made one decision, and the other five didn't? This would be a question that would have to go to the jury, and that's exactly what the objective standard was trying to accomplish in Tennessee v. Gardner. And when Graham v. Connor came out, they were explaining to the jury that they were going to look at the subjective or the intent of the officer. That's how the district court in this case made its distinction. We have cases where someone's reaching into their pocket, and the officer thinks they're reaching for a gun, and we said that's reasonable then to shoot, and it turns out the person's pocket. But we've said the officer has a reasonable basis for using deadly force in that situation. Here, your client pulls his shirt up, pulls the gun out of his waistband when the cops are approaching. So, I mean, he has a gun, and he's pulling it out when the car's approaching. So, isn't this an easier case than the ones where there's just the reaching and the officer doesn't quite know what they're grabbing? I disagree, Your Honor, and here's why. For example, in Ricardo Salazar-Lamon v. the City of Houston, that was similar to what occurred in that instance. One, there was only one officer on the scene, and if you remember what the U.S. Supreme Court said when they reviewed that case on cert, it was that we didn't know exactly what happened. There was only one officer out there. I think what distinguishes issues in cases that come before the court in that manner is that there were a number of officers out there, and a number of them all experienced the same set of circumstances, but something triggered. There was something that happened that stopped Sergeant Billingsley from firing his weapon, and that's really the key difference. You make these judgment calls and split-second decisions, and by definition, a judgment call is within a zone of reasonableness. You're saying, I mean, to Judge Englehart's point, two officers can come to different conclusions without one of them being unreasonable. And the answer to that question has to be, at what point do we allow a jury to make the decision as to reasonableness? And that was what Graham v. Conner was trying to do. The Supreme Court has said reasonableness is a legal question for the court. I mean, that might make sense or be right, but it's clear that there can be underlying factual disputes about what happened, but the ultimate question of what is the issue of fact you want a jury to decide? Not reasonableness, but what is the issue of fact you want the jury to decide? Well, there are several issues of fact. Well, tell me, what are they? The crucial issue of fact that your argument hinges on. The crucial issue of fact is whether or not Officer Billy Mitchell was aware that Mr. Valdez threw the gun in the car, thus terminating the threat. That question, that factual question as to whether he saw Mr. Valdez throw the gun in the car is in dispute at this moment. And even if the court were to determine that this happened so fast that anyone could have not known that Mr. Valdez threw the gun in the car, it becomes another factual dispute when you see Sergeant Billingsley observing the same exact display. And so the factual question from our purposes is Officer Mitchell originally says Mr. Valdez pulls the gun and continues to display it. I shot in fear of the life of the officers. But then in his new affidavit, he changes that particular point. In other words, you're saying that it would have been unreasonable if he had seen him throw a gun into the car and then he started running away from the officers. Is that correct? That's correct, Judge O. And was he shot in the back? Or was he shot? He was shot three times in the back, once mid-dead center to his back. And so if in fact Officer Mitchell saw Mr. Valdez throw that into the car, then we can decide whether or not, hey, is it reasonable? Would a reasonable officer understand that Mr. Valdez throwing a gun into the car terminated the threat? We're talking about the factual circumstances that you want to expose to a jury. Correct me if I'm wrong. Sergeant Billingsley is driving the police vehicle. Is that correct? Yes, yes. And Mitchell is in the passenger side. That's also correct. And so they're approaching and the vehicle where your client is talking to people who are inside the car is on the passenger side of the police vehicle as it approaches, right? So it's on Mitchell's side of the car. That's correct. So in other words, if you're in the position of your client and I'm where Officer Mitchell is heading this way, Mitchell's closer than Billingsley. That's correct. Okay. And Billingsley is driving almost up to the point, I mean, they get pretty close to the car, don't they, on the video? Mr. Valdez thought they were robbers. They were so close that the witnesses in the car thought they were about to be hit by this oncoming unmarked Tahoe. So yes. And to your point, Judge Engelhardt, I think what you're getting to is would it be, even with the facts, circumstances, exactly be identical if Sergeant Billingsley was in the driver's seat and Mitchell was in the passenger seat? And the answer to that question was in the deposition, which is why the critical question was brought up and confirmed four times. Sergeant Billingsley, when you exit the vehicle, you observe Mr. Valdez with the gun. Yes. That told us that he saw the exact same thing that Mitchell saw. And so I would have to say to that point, those are very identical situations, although had he not admitted that he did, in fact, see Mr. Valdez with the gun, that could present an issue as to whether or not they were identical, thus whether or not Mitchell acted more reasonable. In this particular instance, though, we have to go back and Judge Costa, I didn't forget your question. It is a question for the law, whether or not it's reasonable. But remember, we're not under a lot on the discipline circuit personally. The question is whether it's so far that a reasonable fact finder could not determine that the conduct was reasonable. And that's what happened in a lot of cases. So yes, there is a reasonable question that's supposed to be asked by the by the judge. But if it becomes a point in that particular scenario where no reasonable fact finder or a reasonable fact finder strike that could interpret the facts to say, hey, Sergeant Billingsley saw the same exact thing, and he didn't fire his weapon. On a summary judgment, we assume the attending that the court in this case failed to do that. I am your honor. That is one of the major issues. I believe in this particular case, the district court when it viewed Mr. Mr. Mitchell's statement, it simply made a judgment call as to which story you believe, and then said there was no discrepancy in the two statements. I submit today to this court. That's an impossible scenario. Because take, for example, Mr. Mr. Mr. Mitchell's sworn statement. If there's no discrepancy, then his sworn statement should initially independently secure qualified immunity. It does not. And the reason it would never is because the gun was never found in the vehicle. And if Officer Mitchell relies strictly on his sworn statement, you will find that you're being thrown into the vehicle. I am your honor. Did he say that he did? He did not. In fact, he said the opposite, which is why it was most important that we identify that he did, in fact, see Mr. Valdez with the gun. The dynamic in this particular nobody. In other words, he he nobody says that they saw him throw the gun in the gun was never found in the gun was found in the vehicle. Yes, yes, sir. And to answer that first question, yes, the confidential witness at the scene gave an interview right after she made very clear Mr. Valdez threw the gun first and then the officer shot. That was one of the key pieces of evidence struck. I didn't get that. Beverly Rodriguez was a confidential work informant working for the Lubbock Police Department that sold Mr. Valdez that gun three days prior to the issue was that when she was on the scene and that's who he was talking to in the car, she specifically told officers that night that he threw the gun first and then Officer Mitchell started firing. That's a significant difference than than what we heard from Officer Mitchell's side of the story. And the officer found the gun in the car and then puts it back. That is one of the most critical facts and and I submit today to the court. You can wrap up. I submit today to the court that Officer Merritt's statement is the reason Officer Mitchell changed the story and it's the reason why we know what Sergeant Billingsley was looking at and it confirmed what happened at point zero nine of the video. All right, no time for rebuttal. Thank you, Mr. Kirby. May it please the court. My name is David Kirby and I represent Officer Mitchell Leopold in this matter. I want to clarify a few things. Justice Jolly had just asked. In fact, all of the officers testified that they did not see the gun dropped into the vehicle. They did not see the plaintiff discard the gun. The gun was found in the vehicle. I first want to cover the statements of my client Officer Mitchell. The plaintiff never deposed Officer Mitchell, did not ask for his deposition, so we're relying on two statements. We're relying on his affidavit drafted in support of the summary judgment. We're also in your record at one oh three is the statement that was written up for that was he wrote up. I believe it's January 29, 2017. Those statements are consistent. As District Judge Sam Cummings said, he actually put portions in the order he quoted the statements. The only thing that's missing in the second statement would be that he did not mention that he saw a gun on the pavement. It's undisputed that the gun was on the pavement afterwards. What took place, and the record's very clear, the record's very clear. Investigator Merritt was behind my client as my client stepped out of the vehicle. Investigator, after the shooting, Investigator Merritt approached the vehicle to secure the occupants. He found the silver slide with laser sight .40 caliber laying in the lap of the passenger. He removed it, his deposition testimony, and it's in your record that he removed it and set it on the pavement. My client, what he said in his first, which is all correct, all of the officers do not contradict each other here. There seems to be a pitting of one officer against another. All officers are very consistent here. My client's first statement says that he witnessed the gun as he was holding lethal coverage on the plaintiff as he laid on the ground. He didn't say when it got there. He didn't say that he saw it fall there. He just noted that he saw a gun on the ground while he was there. I would, there's nothing showing that he saw it thrown or that he, and he certainly testified that he certainly put his affidavit, he did not see it dropped. There's other, Sergeant Billingsley, his supervisor who was driving the Tahoe testified that the gun was on the pavement afterwards. Investigator, could you, were the circumstances such that you could have observed the gun being thrown into the car, or was he so close to the car that you could not have observed that fact? My client's position, Your Honor? Well, what was your client's position of whatever the objective facts may show? No, I don't believe, the motion was such that they did not see it. He may, he obviously did throw the gun in the lap. He obviously did. It was found there. How close was your client to him at the time that the gun was thrown into the... I have no exact measurement, but I believe the video, and if you look at that, I would say somewhere 10 to 15 feet is what I would assume, Your Honor. And there's also, just going to the gun on the pavement, there's a, I call it a smoke screen, but there's this argument of this gun, and that creates a fact issue. Judge Cummings dealt with it properly. That is not a disputed material fact on what my client observed at the time of the shooting. Where the gun was found afterwards, counsel is attempting through assertions and otherwise to make it an issue of where this gun was found. There's also assertions throughout the case, and I believe his brief had something to do that we didn't immediately search the plane. We're talking about Billingsley, right? I mean, the appellant is talking about Billingsley, and that Billingsley did not shoot. Correct. And the allegation, as I understand it, is that Billingsley did not shoot because he observed that your client did not have, that his client did not have a gun. Is that right? Well, he just, that was briefed that away, but he just argued and told you, which is under the deposition testimony, all three officers' position is, whether through affidavit or testimony, they did not see him drop the gun. To speak directly... Okay, that's what I'm saying. So Billingsley, did Billingsley see him with the gun in his belt as your client did? Absolutely. And that's the testimony, uniform testimony of all the witnesses, is that the last time they saw the gun was in the belt of the plenifier. Almost. The last time they saw the gun was as he drew it out of his waistband. He drew it out of his waistband. He pulled it out. Out of his waistband. And then, is the testimony generally that his disposition, the gun in the car, was simultaneous with his running? Like, through the gun, started running. It was all essentially simultaneous. It's one movement, he pulls it out. And if I may back up, he wanted to show the gun, the testimony and the plaintiff's own testimony, he wanted to pull that to show that car that he had a gun. And he did. He was successful at that. And he pulled it. And the testimony is, as he's pulling it, the passenger in the car tells him, these are the cops. These are the cops. So he continued to pull it. And at that time, Sergeant, as we're approaching, Sergeant, or Investigator Merritt shouts out, he's got a gun, which you hear from the video. Approximately three seconds later, my client hollers police. And one second after that, if you count it, are the sequential shots. He is taking that gun. And from there, he decided to discard rather than to put his hands up. The plaintiff had been, he testified, and it's in the record, he'd been taken into custody many times. And he was familiar with putting his hands up. At that time, he, obviously, my client did not see. My client's only, the only thing in the record from what my client reasonably believes and what he saw at the scene, in the heat of the moment, was the drawing of the weapon. He did not see it discarded. But the plaintiff, knowing it was the officers, obviously discarded. And I think it was simultaneous with him discarding, because the plaintiff took the position that he was a fleeing felony and put his hands up and run backwards and then stopped. That changed, as you'll see in your record. The briefing now- Was the plaintiff's testimony, was the plaintiff's testimony taken in preparation for summer judgment? It was, Your Honor. I deposed the plaintiff. All right. And what did he say, how did he say that it occurred? He said that, well, first he said he had turned and done that. And as the court notes in its order, upon further questioning, because clearly it contradicts the video, he said it was almost simultaneously or immediately as he discarded, he began to slightly turn and he was not shot straight in the back, which is kind of what the question asked earlier, was he shot in the back? He was first shot just at a slight turn through the right shoulder blade, I believe. And then I think there was one that's noted in your record from the Lubbock Police Department records, one round entered close to the neckline, but he was not shot squarely from the back. And he says it was an immediate deal. He said he, the plaintiff- Was his position that he was turning to put his hands up? That was his first position, but he cleared that up for me in the deposition that he did not have his hands up and it was all, it was just simultaneous. Was he running or what did he, what was his explanation for turning? Well, he wanted to run. He wanted to flee because, and we knew that. And that is basically not disputed by the record here. It's not. No, I think he was- That he turned to run. He was an extreme flight risk. He hit on, and I won't belabor it, but on 272 of your record is the dash cam video from the chase just shortly after Christmas where he drove through the residential neighborhood. And his testimony was that he wanted to run. I believe that was his ultimate plan was to run. That's correct, John. On the Sergeant Billingsley, just for clarity, I believe you look at this matter from the perspective of Officer Mitchell. And I do believe to answer your question, Justice Englehart, is that all the officers can act reasonable. When you look at it from Officer Mitchell's perspective, it's what he saw, what he knew, you know, the briefing. He knew he was a known gang member from the West Texas Tango Blast, which the plaintiff has testified to. He knew he'd been in a high-speed chase with 7.4 grams of methamphetamines, which the plaintiff testified to. Despite the criminal attorney telling him to plead the fifth, he testified to that. He was the one driving the Tahoe in the police chase. He testified to that. Let's ask the converse of you then. What would Officer Mitchell, what information would he have possessed or observation would he have made that he acted upon? Is there any distinction between that and what Sergeant Billingsley had? Or are you even making that argument? I'm not, Your Honor. But I would like to clarify for Sergeant Billingsley because I believe there was a misstatement earlier. Sergeant Billingsley has clearly testified that there was a mention of, well, there's a missing fact here. Well, they're required to bring forth a dispute of a material fact. And he's saying there is a missing fact. Well, he didn't depose Officer Mitchell. He deposed Investigator Merritt and Sergeant Billingsley. But to speak to Sergeant Billingsley, his testimony is very clear. He put together the takedown team he was driving. He feared for his life just as Investigator Merritt and just as he saw the weapon, he put the car in park. And I guess because of the automatic lock, when you begin to proceed, he had to mess with the locked door a little bit. So he did break his line of sight. He was exiting and it is clearly in your record and I can point you to the exact page because I've tried to memorize it. He clearly wanted to exit the vehicle to make himself small and not be a stationary target in a gunfight. He thought they were going into a gunfight. He training was don't be a stationary target and be a sitting duck in the front seat of a Tahoe to get shot. And that's what he was doing. Plaintiff has construed that Officer Mitchell said as you exited the vehicle, you saw the weapon. He did. That exiting the vehicle is getting out like this and then he has to mess with the door. He's attempting to have the court take a leap of faith into the he exits out here. The testimony is very clear from Sergeant Billingsley. I exited the vehicle because I didn't want to be a stationary target. I had a problem with the door that I had to deal with just a second. As he exited, he turned to hear and he said only two because the plaintiff said, Well, how did you not hear five? Sergeant Billingsley said he heard the two shots and he saw the plane falling to the ground. When you got away from that, we lose your voice. You don't say that. That's his recording the arguments. That's his testimony. That's very clear. You look at it. So I mean, from the time that someone yelled he's got a gun, you say there was three seconds before the shots occurred at that point. I believe that's correct, Your Honor. Very close there, too. He's got a gun and then 123. So I mean, even that's almost everything is simultaneously occurring. It very closely is. It really is the if you step back even far three seconds. Is that a matter of fact? Are you telling me that? Is that what the record shows? It's in the video. It's the video. If you three seconds, it was approximate on my part counting. There is no fact on the three seconds. There's nobody's testified to exactly three seconds, Your Honor. I would say this from the time the plaintiff knew that the law enforcement that was law enforcement approaching would be longer than three seconds because you could. His testimony is is that he was going to pull it to show it to them. And and then he's doing that. That comes even before he had shown the gun. One other thing that I think is relevant from the record is is a. Did he say did the plaintiff testify why he threw the gun into the car? I don't believe he did. I honestly don't. I believe it's an assumption that he obviously wanted to act like he was not a felon in possession of a firearm. I don't know. And he may. He may have actually said, Your Honor. I correct myself. He may have actually said he didn't want to get shot, so he was throwing the gun in the car. He may have actually said that. I don't know exactly the answer to the question on that. I'll say this. The record is also clear from what the plaintiff told the police department that another vehicle stepping back just a second before the Tahoe approached another vehicle drove by as he was out encountering Beverly Rodriguez, the passenger, and they were actually going to do a drug deal that night. That's what they were in the process of going to do. But another car drove by and the plaintiff testified. Plaintiff told officers in the Lubbock Police Department records that he actually believed that that car was was police, that they were law enforcement. But it was a small sedan, I believe, that drove up and kind of did a little crazy move in the neighborhood. So he was very leery of that car. So even before the Tahoe approached, even before the passenger told him that it was law enforcement, he believed that it was, that there was certainly a likelihood of law enforcement. But the only explanation in the record for his having thrown the weapon into the car is that he didn't want to get shot. I believe that's what you're having to have it and then turn to run through the weapon in the car and then turn to run because you didn't want to get shot. I believe that's correct. Okay, I do believe that's correct. If I may briefly respond, it may not be necessary and I don't want to waste the court's time, but there was an allegation that the gun was sold by a confidential informant. You will find in the record that the gun, the plaintiff testified that he took that exchange because Beverly Rodriguez was smoking his stash of methamphetamine. And then while he had it in his possession, the seven live rounds that were found in it, he does not remember if it was actually loaded with the round in the chamber at the time, but of the incident, but Beverly Rodriguez believed that he was manipulating the gun. But I will say for the three days he had the gun, he purchased ammunition for the gun. He kept the gun with him with him. And during the time that he had, he kept the gun with him that day because although he had left his drug paraphernalia in his motel room, he considered that gun his property and he kept it with him. I will not belabor my points, but I do believe that Officer Mitchell acted reasonably, objectively reasonable. And even on the second prong of a clearly established right, the council has argued no case to show in any way that the plaintiff had a clearly established right that was violated at the time of death. There's no precedent when pulling a gun on someone you believe Officer Mitchell acted reasonably. Thank you for your time. All right. We'll hear from Mr. Daly on his rebuttal. When, as I understand, when he first showed the gun, he thought that the people that were approaching him were robbers. Is that correct? That's correct, Your Honor. And that's the reason he showed the gun? Yes, Your Honor. That's what the- But it's almost simultaneous that whenever he was turning and showing the gun, that he threw it into the car at that point? Is that what you're telling us? Not necessarily, Your Honor. There's about one second or so that continues to come by that he notices the car coming at them at a high rate of speed. He saw them coming, and so he pulled the gun. And while he's pulling the gun halfway out, that's when the confidential witness told him, hey, they're cops, because she looked over and saw what he was doing. At that moment, he realized it and tried to throw the gun inside the car, and that's when he turned it. But at some point there, somebody yelled, he's got a gun, he's got a gun. That's correct. All right. And from that point until you heard shots, how much time had expired? There was approximately 10 seconds, Your Honor. So at .09 seconds, you're going to see the first time someone says police. That's the only time in the very next second is where Officer Mitchell's firing. But where is he's got a gun? He's behind Officer Mitchell. That's the reason he didn't even fire, because he didn't have a line of sight. That's Officer Merritt. Officer Merritt says he's got a gun. I understand that. But how long did it, from the time that the police yelled, he's got a gun, did we hear shots? Approximately two seconds, Your Honor. Two? Yes. And in that middle of those two seconds. Well, now that seems to me that if only two seconds expired, somebody says he's got a gun, so they're seeing the gun there. He's got a gun. Two seconds, pop, pop, pop. That doesn't give much time for him to throw the gun into the car and turn around and leave. I mean, it's all just part of a simultaneous act. And we disagree, Your Honor. Okay, tell me why. Because the gun was already thrown in the car when he realized there were cops. Just because they said he had a gun, that was something that they were saying on their own. He didn't hear anyone say anything that night. He only heard the police as he's shooting. But I thought it's on the video. Somebody yells he's got a gun. That is on the video. But when you hear that, he's already throwing a gun in a car. That's how they figured out he was throwing a gun in a car. They all knew when he pulled up. Let me say it again. When they all pulled up, they saw him pull the gun initially. When he discovered that, everyone started getting out of the vehicle. And before anyone even said and he's got a gun, it was way before police. He's already throwing a gun in a car and turned. And so the minute that Officer Mitchell starts to fire, the gun is way out of his hand. Okay, so it's your argument that when someone yelled he's got a gun, it's someone who saw him throw it in the car. Is that what you're saying? I'm saying that he was in the process of just throwing it in the car. Yes, Your Honor. So they may not have known what he was doing one way or the other, but all they did, they saw a gun and they yelled, he's got a gun. Two seconds passed, pop, pop. Well, not necessarily, Your Honor. And we have to disagree from the standpoint that while it may seem that that was a short amount of time, Sergeant Billingsley saw the same exact thing. And he had enough time to understand that Mr. Valdez was terminating the threat and that deadly force was no longer authorized. He does establish himself as a- I don't understand that argument. The appellee just argued- Maybe you have something else you want to argue. I'm not trying to hog your time, so you just say what you want to say. I think it was important from the standpoint that we also review this case and say, we don't know what Mitchell saw. And if we sit here today and assume that he saw- We do know what Mitchell saw by his word, what he said. That's correct, but he changed it, Your Honor. He now says his hands were concealed. He never saw. In fact, counsel is vehemently arguing that he didn't even see his hands. That's not what he said on January 29, 2017 in his sworn statement, which is why we didn't need to- I read that it was consistent. We'll have to figure that out for ourselves, I guess. That's correct, Your Honor. But it's very clear that if he saw Mr. Valdez displaying a weapon, because of Officer Merritt's testimony and what we discovered, he obviously saw Mr. Valdez placing a gun in the car. And the question then, is it reasonable for him to, at that point, understand and perceive that the threat had terminated? To answer that question, we can't look at the conduct of Mitchell- It sounds to me that two seconds of that, the way I look at it now, would be he has two seconds to make up his mind. He's got a gun. He's got a gun. He's got a gun. And the man turns to run. Pow, pow. Just, Charlie, it seems like that- That sounds like- I don't think you can follow that too much if it occurred like that. I understand, Your Honor. May I respond to this point briefly? Wrap it up. It seems as though that may be a very quick amount of time for an officer to make a split-second decision. And in Tennessee v. Gardner, the petitioner and the appellees both urged Justice White and said, listen, this is an impossible standard. But it is a standard that we have to make. And that question is not obvious for a trier of fact to make. And that's the problem in this case. We just simply cannot make that argument one-sided. It has to go to Sergeant Billingsley. That's what's fair. What did- again, why are you resting so heavily on Sergeant Billingsley again? Because we're told that's not really supported by the record. But I want to hear your statement as to why that's so important again. Sergeant Billingsley- you continually hear evidence that Sergeant Billingsley saw the gun in the car. In fact, the district court said, oh, he pulled it up in this fashion right here at the record 14- page 1487. But what you don't- what keeps getting lost is when they exited the vehicle, they all saw the same display. And when I say all, I mean Sergeant Billingsley and Officer Merritt. You're assuming that. No, no, no. This is what Sergeant Billingsley said. He actually said- We'll have to figure that process. Thank you, Your Honor. Well-argued case from both sides. Thank you. The court will take a break of about 10 minutes.